## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT ("**Agreement**") is effective as of the 10th day of February 2025, by and between

Honor America Capital LLC a limited liability company duly organized, validly existing, and in good standing under the laws of the District of Columbia in the United States, with a principal address at 1626 K Street, NW, Washington DC 20016, represented by its authorized member, Mr. **Abdulla Mishal H. Kh. Al-Thani**, c/o Mizene PLLC 1629 K Street, NW, Ste. 300, Washington DC 20006 ("**Buyer**") and

**Nicolas PUECH** (hereinafter referred to as the "**Seller**"), acting individually and through his duly authorized representative, **Francois BESSE**, residing at Chemin d' Eysins 47, 1260 Nyon, Switzerland ("**Seller Representative**") in his capacity as the attorney under a power of attorney dated September 25th, 2024, ("Power of Attorney"), attached hereto as **Appendix 1**, and

**Eric FREYMOND**, residing at 26 Mount Street, London WK1 2RS, United Kingdom (the "**Consultant**");

with reference to the following facts:

### RECITALS

A. Seller is the legal and beneficial owner of 6,082,615 shares issued by HERMES INTERNATIONAL, a publicly traded company under number FR0000052292 on the Euronext Paris Stock Exchange, and whose registered office is located at 24 rue du Faubourg-Saint-Honore- 75008 PARIS, registered in the Paris Trade and Companies Register under number 572 076 396 (the "Shares").

B. Seller now wishes to sell, and Buyer wishes to purchase the Shares pursuant to the terms and conditions set forth in this "Agreement".

C. Seller Representative, for himself and in his capacity as representative for Seller, represents that the Shares are in the process of being reissued by the custodian, EUROCLEAR (the "Reissuance"), and will be once reissued, transferred to a newly incorporated company: BORYSTHENE LLC, a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware, United States. Seller shall thereafter cause BORYSTHENE LLC to transfer the Shares to Buyer at the Closing.

D. Seller represents that it has granted to the Seller Representative, Mr. Francois BESSE, a power of attorney dated September 25th, 2024, for the purpose of taking any and all decisions and actions necessary for the sale of the Shares, as set out in **Appendix 1** of this document.

E. Seller hereby represents and warrants that, consistent with the mandate given to the Seller Representative under the Power of Attorney attached in Appendix 1, the Seller has never sold, transferred, or otherwise authorized the sale or disposition of the Shares to any third party. The Seller further warrants that it holds full legal and beneficial title to the Shares, free from any encumbrances, claims, or competing interests, and possesses the full authority to enter into and be bound by the terms of this Agreement.

F. Consultant hereby represents and warrants that he has never sold, transferred, or otherwise authorized the sale or disposition of the Shares to any third party and has taken no action to interfere with or otherwise encumber the Seller's full legal and beneficial title to the Shares. The Consultant further warrants that, to the best of its knowledge, the Shares are free from any encumbrances, claims, or competing interests.

G. Buyer represents and warrants that following the closing, it will hold the shares for its own account and that it has full power and authority to enter into and perform its obligations under this Agreement. The Buyer further represents that the individual executing this Agreement on its behalf is duly authorized to do so and to bind the Buyer to the terms herein.

In consideration of the mutual covenants and representations contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by Buyer and Seller, Buyer and Seller agree as follows:

- 1 -



<u>TERMS AND CONDITIONS</u>

1. <u>Purchase and Sale of Stock</u>. Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the aforementioned 6,082,615 shares issued by HERMES INTERNATIONAL, a publicly traded company under number FR0000052292 on the Euronext Paris Stock Exchange, and whose registered office is located at 24 rue du Faubourg-Saint-Honore- 75008 PARIS, registered in the Paris Trade and Companies Register under number 572 076 396 (the "**Shares**"). The Share purchase price shall be the weighted average in Euros of the five trading days preceding the Share Sale date on the Euronext Paris Stock Exchange, subject to the Reissuance of the Shares by EUROCLEAR (the **"Share Deal"**). The Purchase Price shall be paid by delivery of Buyer's payment in full at the Closing (as defined in Section 2 of this Agreement) subject to the simultaneous delivery of the Shares by the Seller to the Buyer at said Closing.

2. <u>Closing</u>. The Share Deal, which for the purpose of clarity consists of the purchase and sale of the Shares, shall occur at a closing ("**Closing**"). The Share Deal shall be deemed complete after (i) the Signing as defined below, (ii) the payment of the Share Deal price and (iii) the transfer of the Shares' ownership. The Closing shall be held at the offices of the Investment Bank designated by the Buyer or at such place as Buyer determines in its sole reasonable discretion. The Parties agree to complete the Share Deal by holding the Closing within three (3) months from the date of Reissuance of the Shares and the confirmation from EUROCLEAR that the Shares are ready to be assigned.

3. <u>Cooperation and Signing</u>. Seller, Seller Representative, and Consultant agree to cooperate with Buyer in completing the Share Deal by taking all reasonable action and steps to complete the Share Deal, and they further agree to sign all documentation necessary to the sale of the Shares (the "**Signing**"), including but not limited to: (a) this Agreement or other share purchase agreement prepared or deemed necessary by Buyer; (b) any share transfer order; and (c) documents required for the registration of the Shares with the custodian EUROCLEAR.

4. <u>Representations and Warranties by Seller, Seller Representative, and Consultant.</u> Seller, Seller Representative, and Consultant (collectively, the "Warrantors") separately and jointly and severally represent and warrant to Buyer as follows:

(a) The Shares are, or will be at the time and place of Closing, duly authorized, validly issued, fully paid, and nonassessable, and are owned by Seller free and clear of all liens, encumbrances, charges, assessments, and adverse claims. The Shares are not subject to any restrictions on transferability to Buyer, except for any that may be required by applicable federal and state securities laws. Upon transfer of the Shares by Seller, Buyer will acquire good and marketable title to the Shares, free and clear of all security interests, liens, encumbrances, charges, assessments, and adverse claims.

(b) As of the date of Signing, BORYSTHENE LLC shall be the sole legal and beneficial owner of the Shares being sold, free and clear of any liens, charges, pledges, encumbrances, or any other third-party rights. The Shares are validly issued, fully paid, and not subject to any restrictions on transfer, except as required by applicable law.

(c) The Warrantors shall indemnify and hold harmless Buyer from and against any and all losses, damages, claims, liabilities, and expenses arising out of or resulting from any breach of the representations and warranties set forth herein.

5. <u>Representations by Buyer</u>. Buyer represents and warrants to Seller as follows:

(a) Buyer is purchasing the Shares for his own account for investment and not with a view to or for sale in connection with any distribution in the United States of the Shares or any portion thereof and not with any present intention of selling, offering to sell or otherwise disposing of, or distributing the Shares or any portion thereof in any transaction other than a transaction exempt from registration under the Securities Act of 1933. Buyer however reserves the right to purchase the Shares through a personal account, or through any company owned by Buyer, or jointly with a person/legal entity designated by him, or any entity designated by Buyer.

(b) Buyer has the capacity to evaluate the merits and risks of an investment in HERMES and to protect his own interests in connection with this transaction. Without limiting the generality of the



foregoing, Buyer is knowledgeable about the plans, operations and financial condition of HERMES and has all the information he deems necessary and appropriate to enable him to evaluate the financial risk inherent in making an investment in the Shares.

(c) The sale of the Shares has not been registered under the Securities Act of 1933, and the Shares will not be resold in the United States unless subsequently registered under the Securities Act of 1933 or an exemption from such registration is available.

6. Exclusivity Period. Seller, Seller Representative, and Consultant (collectively, the "Grantors") hereby agree to grant Buyer an exclusive right to negotiate and complete the purchase of the Shares during a period of exclusivity, which is defined as follows (the "Exclusivity Period"). The Exclusivity Period shall commence on the effective date of this Agreement and shall continue for three (3) months following the reissuance of the Shares and confirmation from EUROCLEAR that the Shares are ready to be assigned. During the Exclusivity Period, each of the Grantors agrees to:

(a) Make themselves reasonably available for any meetings requested by Buyer, Buyer's legal counsel, or Buyer's authorized representatives in connection with the sale of the Shares; and

(b) Refrain from initiating, engaging in, or entering into any discussions, negotiations, agreements, or understandings with any third party regarding the sale, transfer, or disposition of the Shares without the prior written consent of Buyer or Buyer's duly authorized representative.

The Grantors acknowledge that any breach of this clause may cause irreparable harm to Buyer for which monetary damages may be inadequate, and Buyer shall be entitled to seek injunctive relief, specific performance, or other equitable remedies in addition to any other legal remedies available under applicable law.

7. Escrow Account and Financial Arrangements for the Share Deal.

(a) Escrow Arrangement. Seller and Seller's Representative agree that, prior to the Closing, all proceeds from the sale of the Shares shall be transferred to a designated escrow account maintained at an institution selected by Buyer (the "Escrow Agent") in Washington, DC. A written escrow agreement (the "Escrow Agreement") shall be executed among Seller (acting individually and through Seller's Representative), Buyer, and the Escrow Agent. The Escrow Agreement shall define the Escrow Agent's responsibilities, the specific conditions for the release of funds, and the procedures governing the handling and disbursement of the escrowed proceeds. The Escrow Agent shall act solely as a neutral custodian and shall have no discretionary authority over the release of funds, which shall occur strictly in accordance with the Escrow Agreement.

(b) Authority to Select and obtain necessary services. Seller and Seller's Representative agree that Buyer shall have full discretion to select any necessary service providers, including an investment bank and deal legal counsel of its choosing to facilitate the Share Deal and the potential acquisition.

(c) Payment of Transaction Fees. Seller and Seller's Representative agree, along with Buyer, that all fees associated with the escrow agent, escrow bank, investment bank, and legal counsel selected by Buyer shall be paid from the escrow account within one (1) business day of receiving the proceeds from the Share Deal transaction. It is further acknowledged that while these fees shall initially be paid from the escrow account, the ultimate financial responsibility for these costs shall rest with Buyer.

8. Confidentiality. The Parties agree to maintain the strict confidentiality of all information related to this Agreement and the sale of the Shares, including the existence and terms of this sale, as well as any oral or written information received in connection with the transaction, whether in the form of data, documents, or any other medium ("Confidential Information"). This obligation shall apply prior to the sale of the Shares and shall continue for a period of three (3) years following either the completion of the sale or the expiration of the Exclusivity Period, whichever occurs later.

Confidential information shall not include: (a) Information that is or becomes publicly available other than as a result of a breach of this Agreement; (b) Information that a Party can demonstrate was already in its possession before receiving it from the other Party; and (c) Information lawfully obtained from a third party who is not bound by an obligation of confidentiality.



Each Party, including its representatives, legal counsel, employees, and affiliates, agrees to: (a) Maintain Confidential Information as strictly confidential and not to disclose, distribute, or publish it to any third party without the prior written consent of the other Party; (b) Use Confidential Information solely for the purpose of facilitating the sale of the Shares; (c) Share Confidential Information only with their legal counsel, employees, or affiliates who require access to perform duties related to the sale of the Shares, ensuring they are bound by equivalent confidentiality obligations.

Each Party acknowledges that all Confidential Information remains the property of the disclosing Party. The receipt of Confidential Information does not grant the receiving Party any rights, whether express or implied, to use, reproduce, or exploit such information beyond the terms set forth in this Agreement.

Each Party acknowledges that any unauthorized disclosure or use of Confidential Information may cause irreparable harm to the disclosing Party, for which monetary damages may be insufficient. Accordingly, the disclosing Party shall be entitled to seek injunctive relief or specific performance in addition to any other legal remedies available under applicable law.

9. <u>General Provisions.</u>

(a) This Agreement contains the entire agreement between Buyer on one hand, and Seller, Seller Representative and Consultant on the other hand, (sometimes collectively referred to in this Agreement as the **"Parties,"** and, individually as a **"Party"**) pertaining to the subject matter of this Agreement and supersedes any and all prior agreements, representations and understandings of the Parties, written or oral, including, but not limited to the Memorandum of Understanding (the **"MOU"**) by and between Mr. **Francois BESSE, Acting on behalf of Mr. Nicolas PUECH** and Mr. **Abdulla Ahmad A. JAFRI,** , and dated as of **November 22, 2024**. The Parties agree that neither Party has any right or obligation under the MOU, which is superseded by the present Agreement. The present Agreement is intended by the Parties to be an integrated, final, complete and exclusive statement of the terms of their agreement concerning this Agreement. In the course of any prior dealings between the Parties, no uses of trade, and no parole or extrinsic evidence of any nature, shall be used to supplement, modify or vary any of the terms of this Agreement. There are no conditions to the full effectiveness of this Agreement, and there are no oral or other written representations or agreements between the Parties concerning the subject matter of this Agreement except as so expressly set forth in this Agreement. Any representation, promise or condition, whether oral or written, not specifically incorporated in this Agreement, shall be of no valid or binding effect upon the Parties. Each Party further represents, warrants and agrees that he or she is not relying, and have not relied, upon any representation, warranty or statement, oral or written, made by any other Party to this Agreement with respect to this Agreement, except as expressly set forth in this Agreement.

(b) This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed and governed by and in accordance with the laws of, the District of Columbia, without regards to principles of conflicts of law. Any dispute between the parties and any legal proceeding arising out of this Agreement will be brought only in a state or federal court of competent jurisdiction sitting in the District of Columbia. All Parties agree that venue will lie in those courts and submit themselves to the personal jurisdiction of such courts.

(c) No consent or waiver, express or implied, by any Party to, or of any breach or default by any other Party in, the performance of its obligations under this Agreement shall be deemed or construed to be a consent to or waiver of any other breach or default in the performance by such other Party of the same or any other obligations under this Agreement. Failure on the part of a Party to complain of any act of the other Party or to declare a Party in default, irrespective of how long such failure continues, shall not constitute a waiver of such Party of its rights under this Agreement.

(d) If any provision of this Agreement or the application of any provision to any person or circumstance shall be invalid or unenforceable, but the extent of such invalidity or unenforceability does not destroy the basis of the bargain between the Parties as contained in this Agreement, the remainder of this Agreement and the application of such provision or provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

(e) This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, executors, administrators, personal representatives, successors and assigns. This Agreement, or any right or interest under this Agreement, shall not be assignable by any Party without the written consent of all the other Parties.

- 4 -



(f) This Agreement may be executed in one or more counterparts, any one of which, if originally executed, shall be binding upon each of the Parties, and all of which taken together shall constitute one and the same instrument. One or more photostatic copies of this Agreement may be originally executed by the Parties, and such photostatic copies shall be deemed originals and shall be valid, binding and enforceable in accordance with their terms. Delivery of an executed signature page to this Agreement by facsimile, e-mailed .pdf .gif or similar complete image file of a signed original counterpart shall be effective to the same extent as if such Party had delivered a manually executed counterpart.

(g) The Parties represent and warrant that they have full power, authority and legal right to execute and deliver, and to perform and observe the provisions of, this Agreement and to carry out the transactions contemplated by this Agreement. The execution, delivery and performance by the Parties of this Agreement have been duly authorized by all necessary legal action and the Parties have obtained any necessary consent, approval of, notice to, or any action by, any person, firm, corporation or governmental entity or agency necessary or appropriate to consummate the transaction contemplated by this Agreement.

(h) Each Party agrees and covenants that it will at any time and from time to time, upon the request of the other Party, execute, acknowledge, deliver or perform all such further acts, deeds, assignments, transfers, conveyances and assurances as may be required to carry out the terms and provisions of this Agreement.

(i) The rights and remedies of the Parties under this Agreement shall not be mutually exclusive, and the exercise by any Party of any right to which he, she or it is entitled shall not preclude the exercise of any other right he or she may have.

(j) Each Party represents and warrants that in executing this Agreement such Party has had the opportunity to obtain independent accounting, financial, investment, legal, tax and other appropriate advice; that the terms of the Agreement have been carefully read by such Party and its consequences explained to such Party by his or their independent advisors, and that such Party fully understands the terms and consequences of this Agreement. Each Party further represents and warrants that, in executing this Agreement, such Party has not relied on any inducements, promises or representations made by the other Party (except those expressly set forth in this Agreement) or the accountants, attorneys or other agents representing or serving the other Party. Each Party represents and warrants that his or their execution of this Agreement is free and voluntary.

(k) No provision of this Agreement or any of the documents referred to in this Agreement may be amended, modified, supplemented, changed, waived, discharged or terminated, except by a writing signed by or on behalf of each Party.

(l) Any notice to be given under this Agreement must be addressed to Seller at the principal residence address of Seller's Representative, or at such other address as Seller may specify in writing to Buyer. Any notice to be given to Buyer must be addressed to Buyer at the address appearing as the home address of Buyer in HERMES's books and records or at such other address as Buyer may specify in writing to Seller.

(m) This Agreement shall be construed in accordance with its fair meaning as if prepared by all Parties and shall not be interpreted against either Party on the basis that it was prepared by one Party or the other. The captions, headings, and sub-captions used in this Agreement are for convenience only and do not in any way affect, limit, amplify or modify the terms and provisions of this Agreement. Words used in the masculine gender shall include the neuter and feminine gender, words used in the neuter gender shall include the masculine and feminine, words used in the singular shall include the plural, and words used in the plural shall include the singular, wherever the context so reasonably requires.

(n) Time is hereby declared to be of the essence of this Agreement and of every part of this Agreement.

(o) Each Party hereby waives all rights to plead or assert at any time any statute of limitations as a defense or bar to any action or proceeding brought to enforce any obligations secured hereby.

IN WITNESS WHEREOF, the parties have executed this Agreement as of February 10th, 2025, to be effective the day and year first set forth above.

- 5 -



"**SELLER**"
**Nicolas Puech**

_____
Nicolas PUECH

"**SELLER'S REPRESENTATIVE**"

_____
Francois BESSE

"**CONSULTANT**"

_____
Eric FREYMOND

"**BUYER**"

**Honor America Capital LLC**

_____
By **Abdulla MISHAL H. KH. AL-THANI**

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**APPENDIX 1**

**POWER OF ATTORNEY DATED SEPTEMBER 25th, 2024**

[REMAINDER OF PAGE INTENTIONALLY BLANK]

# POWER OF ATTORNEY

I, the undersigned Mr. Nicolas PUECH, born in Neuilly-sur-Seine on ███████████
███████████████████████████████████ residing in Ferret, 1937 Orsières
(Switzerland), hereby grants

## POWER OF ATTORNEY

to Dr. François BESSE, attorney-at-law, 47, chemin d'Eysins, 1260 Nyon,
Switzerland, to represent me and act on my behalf in any and all decisions and
actions concerning my assets, in particular in the sale of all or part of the shares of
Hermès International (FR0000052292) that I hold or will be holding on the day of the
sale.

This power of attorney gives Dr François BESSE the broadest powers to do anything
he deems necessary or useful in this context by his signature alone. In particular, by
way of example, Dr François BESSE may

- create, administer or liquidate any legal entities;

- open, administer or close all bank accounts;

- receive all cash and/or securities, all securities and/or other objects, as well as make
and/or receive all payments;

- sign all deeds, contracts, documents and/or requisitions;

- represent me in general before any bank or securities dealer, the latter being
relieved, with regard to François BESSE, of all obligations resulting for them from
banking secrecy and/or dealer secrecy, upon simple presentation of this power of
attorney.

Neither my death, nor the declaration of absence, nor my civil incapacity or my
bankruptcy will terminate this power of attorney, the effects of which will therefore
remain entirely valid, including after my death.

**For all disputes that may arise from this power of attorney, the principal
expressly declares that he accepts the exclusive jurisdiction of the courts of the
domicile of the agent and the application of Swiss law.**

Thus done in Ferret, on September 25th, 2024

) the undersigned Pierre Bernard FAVROD-COUNE, NOTAIRE
et Château d'Oex, Switzerland, certify that this is a true
copy of the original holding the real signature of Mr. Nicolas
PUECH.

Château d'Oex, this 26th day of September 2024



---

**APOSTILLE**

(Convention de La Haye du 5 octobre 1961)

1. Pays: SUISSE
   Country : SWITZERLAND

   Le présent acte public
   This public document

2. a été signé par *Pierre Bermane Favrod-Coune*
   has been signed by

3. agissant en qualité de *Notaire* ...........................
   acting in the capacity of

4. est revêtu du sceau/timbre de *P.B. Favrod*
   bears the seal / stamp of
   *-Coune - Notaire* ...........................

   **Atteste**
   Certified

5. à Lausanne    6. le *26 septembre 2024*
   at Lausanne       the

7. par la Chancellerie d'Etat du Canton de Vaud
   by the Chancellery of the State of Vaud

8. sous No *16945*
   N°

9. Sceau/timbre:          10. Signature:
   Seal / stamp :              Signature:
                           pr le Chancelier d'Etat:
                           for the State Chancellor :

                           Isabelle AMIGUET





[redacted]

PASSEPORT
PASSPORT
RÉPUBLIQUE FRANÇAISE
P
FRA
22HE74517
PUECH usage PUECH-HERMES
[redacted]
Signature du titulaire / Holder's signature

Photocopie conforme à l'original,
l'atteste



**APOSTILLE**
(Convention de La Haye du 5 octobre 1961)

1. Pays: SUISSE
   Country : SWITZERLAND

   Le présent acte public
   This public document

2. a été signé par *Pierre Bermane Faured-Couns*
   has been signed by

3. agissant en qualité de *Notaire*
   acting in the capacity of

4. est revêtu du sceau/timbre de *P.B. Faured*
   bears the seal / stamp of
   *- Coune Notaire*

**Attesté**
Certified

5. à Lausanne          6. le *26 Septembre 2024*
   at Lausanne             the

7. par la Chancellerie d'Etat du Canton de Vaud
   by the Chancellery of the State of Vaud

8. sous No *16946*
   N°

9. Sceau/timbre:                10. Signature:
   Seal / stamp :                   Signature:

                                pr le Chancelier d'Etat:
                                for the State Chancellor:

                                **Isabelle AMIGUET**

